# NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Suzanne WHITLOCK,

Plaintiff,

v.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY,

Defendant.

Case No.: 25-cv-0964-AGS-VET

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT (ECF 30) AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT (ECF 29)**

After plaintiff's claim for disability benefits was denied, she sued her insurance carrier. She seeks past benefits owed and a declaration that the insurer violated her insurance policy. The parties disagree about whether state or federal law governs, as well as whether plaintiff's claim qualifies for any benefits. They now bring dueling motions for judgment under Federal Rule of Civil Procedure 52.

## BACKGROUND

When plaintiff Suzanne Whitlock was working for "Lockton Companies" (AR 151), it offered its employees an overall "Welfare Benefit Plan" (ECF 30-2, at 5–30), as well as additional "top-up" options designed to supplement those benefits (ECF 30-1, at 3). The top-up plan was "funded through the purchase of individual disability insurance policies" issued by the defendant here, Provident Life and Accident Insurance Company, and its parent company Unum Group. (*Id.* at 2–3.) These plans were "voluntary," and the premiums were deducted from the employee's paycheck. (*Id.* at 3–4.) While employed at Lockton, Whitlock "elected to participate" in this top-up plan. (*Id.* at 6.) She then left the company, chose "to keep the coverage, and pa[id the] premiums herself," though she "retained the [] premium discount Lockton [had] negotiated." (*Id.*)

Years later, Whitlock had occasion to seek this policy's benefits. In January 2021, she was diagnosed with "Generalized anxiety disorder" and "Major depressive disorder, single episode, mild." (AR 1100.) At that time, her psychiatrist recommended that she work "no more than 40 hours per week" (AR 1077), but later advised that she lower her work hours even more, eventually recommending "no more than 32 hours per week" (AR 1075). Months later, she "reduced" her "workload" and her "salary was significantly reduced" per an agreement with her then-employer HUB. (AR 1050.) Shortly thereafter, she filed a disability-benefits claim with Provident, alleging an onset date of May 1, 2021. (AR 49.) In 2022, while her claim was pending, Whitlock left her HUB job. (*See* AR 1075–76.) Provident later denied her claim. (AR 1049.)

After her administrative appeal of that decision was rejected, Whitlock sued Provident in federal court. (ECF 1, at 3.) Although she was initially represented by counsel in this lawsuit, she later discharged her attorneys and opted to represent herself in these Rule 52 proceedings. (*See* ECF 10-2, at 1–2; ECF 11.)

## DISCUSSION

"Under Rule 52, the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true." *Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 990 (N.D. Cal. 2008); *see Arko v. Hartford Life & Accident Ins. Co.*, 672 F. App'x 693, 693 (9th Cir. 2016) (reviewing the trial court's "'bench trial on the record' under Rule 52 of the Federal Rules of Civil Procedure"). In other words, "in an ERISA benefits denial case," the judge must make "something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006).

To adjudicate the Rule 52 motions here, this Court must decide: (1) whether the Employee Retirement Income Security Act or state law controls the analysis of this policy; (2) if ERISA generally applies, whether this policy qualifies for ERISA's "safe harbor"

exemption; (3) whether Provident applied the appropriate "partial disability" standard to plaintiff's claim (and whether any error on that score is harmless); and finally, under the correct legal framework, (4) whether Whitlock qualifies for disability benefits per the policy.

**A. Does ERISA or State Law Govern This Policy?**

As relevant here, ERISA regulates any "employee benefit plan" that is "established or maintained" by an "employer engaged in . . . any industry or activity affecting commerce." 29 U.S.C. § 1003(a), (a)(1). The term "employee benefit plan" includes any employer-established or -maintained insurance plan providing "benefits in the event of . . . disability." *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan"); *id.* § 1002(3) (defining the term "employee benefit plan" to include any "employee welfare benefit plan"). If ERISA applies, it typically "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a). Whether ERISA covers a plan "is a question of fact, to be answered in light of all the surrounding circumstances from the point of view of a reasonable person." *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 (9th Cir. 1998) (emphasis omitted). Because "ERISA preemption is a federal defense . . . the burden is on the defendant to prove the facts necessary to establish it." *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988).

Turning to our case, the interstate-commerce element is satisfied. An "insurance company doing business across state lines engages in interstate commerce." *Humana Inc. v. Forsyth*, 525 U.S. 299, 306 (1999). Lockton is located in "Kansas City," Missouri; Provident is in "Chattanooga," Tennessee (ECF 30-1, at 9); and plaintiff is between California and Utah (AR 238, 300). The meatier issue is whether Whitlock's employer established a plan covered by ERISA.

In the Ninth Circuit, "an employer . . . can establish an ERISA plan rather easily." *Steigleman v. Symetra Life Ins. Co.*, No. 23-4082, 2025 WL 602175, at *2 (9th Cir. Feb. 25, 2025) (*Steigleman II*) (cleaned up). Among other things, courts look at the depth of the

employer's negotiations or coordination with the insurer as well as the level of administrative responsibility the employer took on. Of course, "bare purchase of insurance . . . does not by itself constitute an ERISA plan." *Kanne*, 867 F.2d at 492. Nor would ERISA be triggered by an employer that acts as a "mere advertiser who makes no contributions on behalf of its employees." *Steigleman II*, 2025 WL 602175, at *2. But so long as there is evidence that the employer "specifically contracted with [the insurance provider] to extend disability coverage to her employees or otherwise 'arranged for' that coverage," then the employer established the plan in accordance with ERISA. *Steigleman v. Symetra Life Ins. Co.*, No. 21-15613, 2022 WL 912255, at *1 (9th Cir. Mar. 29, 2022) (*Steigleman I*); *see also Steigleman II*, 2025 WL 602175, at *2 ("Even if an employer does no more than arrange for a group-type insurance program, it can establish an ERISA plan[.]"). In addition, for ERISA purposes, if "the benefit package implicates an ongoing administrative scheme," courts will deem the benefits to be "provided pursuant to an [ERISA-triggering] employee welfare benefit plan." *Steigleman II*, 2025 WL 602175, at *2 (cleaned up). Such an ongoing scheme "might involve a responsibility to pay benefits on a regular basis or periodic demands on an employer's assets that create a need for financial coordination and control." *Id*. (cleaned up).

The defense contends that plaintiff's original employer, Lockton, cleared this low ERISA bar. After all, the company "negotiated and established" this long-term disability policy, "including discounted premiums, full portability, tax-free benefits, payroll deduction, guaranteed issue, and level premiums." (ECF 30-1, at 4.) Plus, "Lockton would receive a single bill for the premiums charged on behalf of all its participating employees and submit that lump sum premium directly to Provident." (ECF 30-1, at 5.)

Whitlock disputes any ERISA coverage on three main grounds. First, she argues that Lockton's involvement "do[es] not constitute plan sponsorship, establishment, or maintenance." (ECF 29, at 14.) She points out that its role consisted of merely "permitting insurer communications, facilitating post-tax payroll deductions, and transmitting enrollment data." (ECF 29, at 14.) Yet it seems that such operational functions would

support ERISA coverage, not undercut it. After all, in assessing whether a plan implicates ERISA, courts give weight to whether the employer undertook the "administrative tasks associated with the maintenance of an ERISA plan." *Steigleman I*, 2022 WL 912255, at *1.

At any rate, Lockton did much more than these clerical or procedural duties. For example, it negotiated with Provident's parent company Unum for various benefits, including a "discounted rate" for its employees, "which represented a 30% reduction from the premiums for the product as then-currently charged in the marketplace." (ECF 30-1, at 4; *see also* ECF 30-1, at 14 (Lockton's notice to its employees that it offers "Unum's Supplemental Individual Disability Insurance" "at a **discounted rate**" and that Lockton "carefully selected this benefit to be an attractive part of [its employees'] financial planning").) Negotiating such discounts alone likely falls within ERISA's scope. *See Zide v. Provident Life & Acc. Ins. Co.*, No. SACV 10-00393-JVS, 2011 WL 12566818, at *7–8 (C.D. Cal. Apr. 13, 2011) (collecting cases and finding that "the weight of authority counsels in favor of a conclusion that such a discount is a 'contribution' by an employer").

Whitlock brushes off Lockton's negotiations with Unum for factual and legal reasons. On the facts, she questions "whether Unum's purported 'discounts' exist at all," pointing out that "[a]nyone can mark up, and mark down numbers . . . in [a] spreadsheet." (ECF 29, at 25.) But Provident's declaration about those very discounts—signed "under the penalty of perjury"—puts that question to rest. (*See* ECF 30-1, at 4, 6.) On the law, Whitlock argues that "premium discounts offered by insurers do not transform an individually owned policy into an ERISA plan." (ECF 29, at 25.) But the case she relies on—*Gooden v. Unum Life Ins. Co. of Am.*, 181 F. Supp. 3d 465 (E.D. Tenn. 2016)—does not stand for that proposition. In *Gooden*, the court merely held that it "need not resolve the question of whether negotiation of a group discount can ever constitute a contribution to an insurance program." *Id.* at 474. Nonetheless, the *Gooden* court collected several "negotiated-discount cases as authority for the conclusion that any discount is a contribution." *Id.* (cleaned up).

In her second rebuttal, Whitlock brandishes a letter from Provident that allegedly "confirms that state law, not ERISA, controls Plaintiff's claim." (ECF 29, at 33.) But that's not what the letter says. It merely states that Provident would consider her "claim for disability" after "direction from the California Department of Insurance." (ECF 29-1, at 48.) This is no surprise. That agency often works with insurance companies administering ERISA plans. *See, e.g.*, *Wise v. MAXIMUS Fed. Servs., Inc.*, 445 F. Supp. 3d 170, 181 (N.D. Cal. 2020) (reviewing ERISA "denial of benefits" claim in which "the California Department of Insurance" conducted "an independent medical review"). The reference to a state agency is not a concession that state law governs.

Finally, plaintiff asserts that "ERISA disclosure is a predicate to ERISA adjudication" and that failure to comply with those disclosure requirements removes a policy from ERISA's ambit. (ECF 29, at 9.) Not so. "Although ERISA contains numerous requirements that a plan must adhere to," "[f]ailure to meet these requirements does not exempt [the plan] from coverage by ERISA." *Scott v. Gulf Oil Corp*., 754 F.2d 1499, 1503 (9th Cir. 1985). And, even if that were not the law, Lockton *did* file mandated ERISA disclosures. (*See* ECF 31, at 5 ("Form 5500" disclosure of "Employee Benefit Plan"); *id.* at 77 ("Summary Annual Report" of Lockton's "Welfare Benefit Plan").) So, there was no "[p]ost-[h]oc" "ERISA-IF-ICATION," as plaintiff suggests. (ECF 29, at 29–30.)

The Court concludes that ERISA covers this policy and preempts state law, absent some exemption. The parties disagree about whether the long-term disability plan should be "severed" from the overarching "Welfare Benefit Plan." Either way, the long-term disability plan is governed by ERISA.

**B. Does ERISA's "Safe Harbor" Exemption Apply?**

Whitlock contends that this plan falls under ERISA's "safe harbor" regulation, which exempts from ERISA certain group-type insurance programs. *See* 29 C.F.R. § 2510.3-1(j). There are four prongs a plan must meet to avoid ERISA's wide sweep. First, "no contributions" can be "made by an employer." *Pacificare Inc. v. Martin*, 34 F.3d 834, 837 (9th Cir. 1994) (quoting 29 C.F.R. § 2510.3–1(j)). Second, "[p]articipation in the

program is completely voluntary for employees." *Id*. Third, the employer's "sole functions" regarding "the program are, without endorsing the program, to permit the insurer to publicize the program to employees," to "collect premiums through payroll deductions or dues checkoffs," and "to remit them to the insurer." *Id*. And finally, the "employer" cannot receive "consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, or administrative services actually rendered in connection with payroll deductions or dues checkoffs." *Id.* "A plan failing to meet any one of these criteria cannot be excluded from ERISA coverage." *Id.*

This plan fails the third and fourth safe-harbor prongs—endorsement and consideration. Let's start with employer endorsement. For safe-harbor purposes, an employer "endorse[s] a program" if:

> in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

*Johnson v. Watts Regul. Co*., 63 F.3d 1129, 1135 (1st Cir. 1995). Lockton's actions would lead any reasonable employee to believe that Lockton didn't merely help make the plan available, but that Lockton exerted control over the plan or made it appear to be part and parcel of the company's own benefit package. For example, Lockton negotiated reduced rates and offered the plan with its broader welfare plan. (*See, e.g.*, ECF 30-1, at 14.)

The analysis of the consideration prong is even more straightforward. According to Lockton's "Welfare Benefit Plan" disclosure form, the "[p]erson[] receiv[ing] commissions and fees" for this plan is "Lockton Companies LLC." (ECF 31, at 7 (Form 5500 disclosure).) Because Lockton received a commission in connection with this plan, the policy fails the consideration test and does not satisfy the safe-harbor requirements.

What are Whitlock's arguments for safe-harbor exemption? She relies on *Koo v. Unum Group*, 813 F. Supp. 3d 1062 (C.D. Cal. 2025), in which the "employer" "signed the same one-page 'Employer Sponsored Agreement' as Lockton," and the court found that ERISA's "safe harbor applies in full." *See id*. at 1066, 1074; (ECF 29, at 23–24). But the differences between that case and ours are stark. Though the *Koo* plan appears similar to the one here, the employer's *role* in administering that plan was not. Unlike Whitlock's employer, the employer in *Koo* expressly stated it "does not sponsor, contribute to or endorse this program and it is not a plan subject to [ERISA]." *Koo*, 813 F. Supp. 3d at 1066. Also, in contrast to our case, the *Koo* court found that the employer "received no consideration" and thus satisfied the fourth safe-harbor prong. *Id.* at 1074. In a final departure from our facts, the *Koo* company "did not produce or identify any Form 5500s, a plan instrument, a trust agreement, a summary plan description, any employer plan documents, or any communications showing [the employer's] sponsorship or administrative control." *Id.* at 1067. (*Compare* ECF 31-1 (Form 5500); ECF 30-1, at 11 ("Lockton Memorandum" informing employees of the "Lockton[] company[-]provided Long Term disability program"); *id*. at 13–30 (Lockton-created "Enrollment Kit" for the top-up plan).)

Thus, *Koo* does not alter this Court's analysis, and the "safe harbor" regulation does not exempt this plan from ERISA. In a later section, the Court will consider Whitlock's first claim for relief: an ERISA benefits claim. But her complaint includes two other causes of action, which were pleaded in the alternative under California state common law in case the Court found "the Policy is not governed by ERISA." (*See* ECF 1, at 5.) Because of ERISA's applicability, those "state common law causes of action arising from the improper processing of a [benefits] claim are preempted by federal law." *Kanne*, 867 F.2d at 493.

The second and third claims, based on state common-law causes of action, are dismissed.[1]

### C. Did Provident Apply the "Partial Disability" Standard to this Claim?

Next, Whitlock argues that Provident evaluated her claim under a "Total Disability standard," rather than the proper "Partial Disability" framework, which is an error she deems "dispositive." (*See* ECF 35, at 3.) On the facts, she has a point. In the original denial of benefits, Provident wrote: "We have determined that you do not meet the policy's definitions of *Total Disability* or *Residual Disability*." (AR 1049 (emphasis added).) Those two disability classifications are distinct from the "Partial Disability" that plaintiff sought under the insurance contract. (*See* AR 1583–87 (defining the three categories of "Total Disability," "Partial Disability," and "Residual Disability").)

Unfortunately for Whitlock, that error is not as dispositive as she imagines. First, regardless of any misclassification by Provident, the reviewing physicians applied the correct standard. As plaintiff elsewhere concedes, those doctors were not presented with the "policy provisions" at all. (ECF 29-1, at 76.) They were instead "asked to comment, within their board certifications," on plaintiff's "functional capacity, given the certified vocational" analysis for her "usual occupation[]." (*Id.*) In other words, they conducted an independent review without applying *any* policy-related standard.

Second, and more importantly, that initial decision was not the end of the process. ERISA mandates "reasonable procedures" for "appeal of adverse benefit determinations" to the plan administrator. 29 C.F.R. § 2560.503-1(b). If the internal administrative review process affirms the denial of benefits, a claimant may bring a "civil action" under ERISA. *See* 29 U.S.C. § 1132(a)(1); *see also* 29 C.F.R. § 2560.503-1(g)(1)(iv) (requiring that

---

[1] If the foregoing analysis were wrong and state law governed this insurance policy, Whitlock might face a different obstacle: the two-year statute of limitations. *See* Cal. Civ. Proc. Code § 339. Provident issued its final denial of her claim on "November 2, 2022," but this action was filed well over two years later, on April 22, 2025. (*See* ECF 1, at 3, 8.)

"notification of any adverse benefit determination" include a "a statement of the claimant's right to bring a civil action under section 502(a) of the Act [codified at 29 U.S.C. § 1132(a)] following an adverse benefit determination on review"). Plaintiff followed that procedure. Critically, the Appeal Decision letter—which is the plan administrator's *final* word on the issue—used the correct standard. That letter has a section entitled "**Policy Provisions that Apply to the Appeal Decision**," which explains that Provident relied on the policy "provisions listed below" in "making [its] decision." (AR 1425.) Then, in a subsection labeled "**PARTIAL DISABILITY**," the letter lays out the policy requirements for "**Partial Disability** or **Partially Disabled**" status, including, among other things, that the plan participant is "not Totally Disabled." (AR 1426.) In that context, the letter goes on to explain what the term "totally disabled" means. (AR 1426–27.)

Finally, even if Provident had applied the wrong standard, it would not necessarily lead to an award of benefits, as Whitlock supposes. In fact, "an administrator's failure to comply with . . . procedural requirements ordinarily does not alter the standard of review," which may be prescribed in the policy. *See Abatie v. Alta Health & Life Ins.*, 458 F.3d 955, 971 (9th Cir. 2006). Even when an administrator commits "wholesale and flagrant violations of the procedural requirements of ERISA," courts don't automatically reverse the decision. *See id*. Instead, we merely impose a "de novo" review standard to the flagrantly offending "administrator's decision to deny benefits." *Id*. As this Court presumes that standard applies here anyway (as discussed below), Provident's alleged procedural irregularities—even if true—make no difference to the analysis.

At any rate, the Court concludes that Provident ultimately applied the appropriate "partial disability" standard in assessing Whitlock's claim. Even if this were not so, the issue would be moot, as this Court will conduct a de novo review of the denial decision.

**D. Is Whitlock Entitled to Disability Benefits Under the Policy?**

Finally, we reach the merits of Whitlock's sole remaining cause of action: a claim for benefits under ERISA § 502(a)(1)(B) (codified at 29 U.S.C. § 1132(a)(1)(B)).

**1. *Standard of Review***

"ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). In *Firestone Tire*, however, the Supreme Court instructed trial judges to review such a "denial of benefits" "under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115.

Lockton's full Welfare Benefit Plan grants the "Plan Administrator" the "discretionary authority to interpret the Plan in order to make eligibility and benefit determinations as it may determine in its sole discretion." (ECF 30-2, at 11.) When an administrator "exercises [such] discretionary powers," the standard of review would normally switch from the default de novo standard to a "deferential standard of review," which would be far worse for Whitlock. *See Firestone Tire*, 489 U.S. at 111. By contrast, the long-term disability plan omits any mention of this type of discretionary authority. (*See* AR 1565–90; *see also* AR 1554–64.) For the sake of argument, and because it doesn't change the result, the Court presumes that the long-term disability plan here is severable from Lockton's full benefits package. Thus, *Firestone Tire*'s default standard applies, and the Court adopts a de novo standard of review.

**2. *Burden***

"[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

**3. *Analysis of Disability-Benefits Claim***

To qualify for partial-disability coverage under the long-term disability plan here, Whitlock must prove that, during the relevant period:

1. She had "a Loss of Earnings of at least 20%";

2. She was "performing with reasonable continuity, one or more of the material and substantial acts necessary to pursue [her] Usual Occupation in the usual and customary way"; and

3. She was "not Totally Disabled," but she was "unable to perform all of the material and substantial acts necessary" or was "unable to perform them for as long as normally required."

(AR 1572 (Individual Disability Income Policy's definition of "**Partial Disability** or **Partially Disabled**"); *see also* AR 1573 (identical definition of these terms once "benefits have been paid for the duration of the Usual Occupation Period," except that it expands the second requirement—"performing with reasonable continuity"—to include acts performed in "another occupation").)

Plaintiff has done little to satisfy her burden of proving these elements. To her credit, she has shown a salary reduction of more than 20%. (*See, e.g.*, AR 773–74 (cataloging a biweekly salary reduction of roughly 32.5%, from "[$]5,662.30" to "[$]3,820.18").) But she offered virtually no evidence on the other elements. While Whitlock makes a conclusory assertion that she "satisfied the Policy's Partial Disability requirements," she largely chose not to brief why she was entitled to benefits. (*See* ECF 35, at 5; *see also* ECF 29; ECF 35.) She instead fixated on "whether ERISA applies" and whether the insurer failed to evaluate her claim under "the Policy's Partial Disability standard." (ECF 35, at 3, 5–7; *see also* ECF 29.)

In fact, she argues that defendant's focus on whether she met "her burden of proving disability" is "improper[]," "premature[,] and misframed," as it "presupposes the applicability of ERISA." (ECF 35, at 3.) Wrong on all counts. The defense is well within its rights to question whether Whitlock has proven her case. The matter is explicitly raised and fully briefed in defendant's motion, placing it squarely before the Court. Plaintiff elected not to address it, leaving this merits-based defense functionally unopposed.

In the normal case, the Court's journey would end here. It is not the Court's task "to scour the record" on a party's behalf. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

(discussing summary judgment). "Judges are not like pigs, hunting for truffles buried in briefs" or in the docket. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). For this reason, courts "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes [an adverse] judgment." *See Keenan*, 91 F.3d at 1279. Whitlock has not done so. Nor has she otherwise carried her burden on the merits in this Rule 52 proceeding.

**4. *Further Analysis of Whole Record***

Nonetheless, the Court will press on a little further. We will review the arguments and evidence that Whitlock raised in the underlying proceedings in the record. The extra effort ultimately does not alter the outcome. But it should make clear that the Court has taken pains to consider every reasonable argument on behalf of this self-represented plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (holding that "pro se" filings are "to be liberally construed").

There are some caveats concerning the administrative record. Aspects of it appear to have been "supplemented" by Whitlock. For example, plaintiff added a section in her medical records called "Suzanne's observations," in which she speculates about "boilerplate wording" and even "ask[s] that [the notes] be disregarded." (AR 1081.) And the "SUMMARY OF PSYCHIATRIC MEDICAL RECORDS" seems to be part of plaintiff's argument in her initial administrative appeal, not an official medical synopsis. (AR 1079–83.) The Court will consider these as arguments, but it will "not rely on her summary of the content of any document; instead, the Court has reviewed all documents . . . and drawn its own conclusions as to their content." *Argonaut Ins. Co. v. Elite Home Med. & Respiratory Inc.*, No. SACV 11-01445-JVS (MLGx), 2012 WL 12893519, at *1 n.4 (C.D. Cal. Nov. 5, 2012). At any rate, because the administrative record was jointly submitted—and plaintiff is proceeding without counsel—the Court accepts the record in its current state, unless otherwise noted. (*See, e.g.,* ECF 45 (ruling on motions to strike).)

For convenience, the Court proceeds (mostly) chronologically through this evidence.

a. *Emergency Room Visit (February 2020)*

The earliest medical event that Whitlock mentions is an "Emergency Room Visit" on February 25, 2020. (AR 1081.) It offers no more than faint support for any relevant medical impairment, as the evidence is equivocal and this hospital visit was over a full year before plaintiff's claimed May 2021 disability date. Plaintiff hints that this was a psychiatric hospitalization, as she alleges that it came "after a confrontation at work. I temporarily lost my memory and couldn't drive." (*Id.*) But the record itself tells a somewhat different story. The treating physician wrote that Whitlock presented with "lightheadedness and dizziness," and she was "concerned she may have carbon monoxide poisoning" because of a "gas leak" in her office. (AR 1150.) The most that can be said for Whitlock's position is that the doctor believed there was "a component of anxiety [in] the patient['s] symptoms." (AR 1154.)

b. *Original Batch of Medical Records (March 2021 to February 2022)*

The medical records that plaintiff first submitted in support of her disability claim span from January 2021 until February 2022. (AR 11.) They are mostly limited to her self-reported symptoms, which were often in tension with the objective medical findings. For example, according to the notes from plaintiff's first visit, she "describe[d] generalized anxiety symptoms" and "appear[ed]" "unhappy." (AR 799, 801.) Yet the notes also reflect "speech that is normal in rate, volume, and articulation and is coherent," as well as normal psychiatric impressions: "[a]ssociations [were] intact, thinking [was] logical, and thought content appear[ed] appropriate." (AR 801.) For those reasons, Dr. Manov concluded that her "severity" was "low" based on her "description of interference with functioning." (AR 800.)

The clinical test that bolstered her claim best was the GAD-7, a seven-item self-report "questionnaire for screening and measuring generalized anxiety disorder." *Jeremy S. v. O'Malley*, No. 23-cv-00184-AJB-JLB, 2024 WL 343179, at *10 (S.D. Cal. Jan. 29, 2024). "Scores of 5, 10, and 15 are taken as the cut-off points for mild, moderate and severe anxiety, respectively. When used as a screening tool, further evaluation is

recommended when the score is 10 or greater." *Id*. In March 2021, Whitlock had a concerning "GAD-7" score of "18" out of 21, in the severe range. (*See* AR 795.) But during the claimed disability period, in September 2021, her score dropped to "9" out of 21, indicating only mild anxiety. (*See* AR 789.)

Toward the end of this period, plaintiff had a second visit to the Emergency Department on January 21, 2022—one week after she resigned from HUB. (AR 1082.) Once again, her self-reporting and memory of this event is somewhat at odds with the medical-record evidence. Plaintiff asserts that this emergency trip was a "[m]oderate episode of major depressive disorder" as an "[a]cute reaction to situational stress." (*Id*.) She described the triggering events as her "stressful job," "especially" the "4th quarter," as well as "[o]ne of her assistants [going] out on stress leave." (*Id*.) Yet the relevant hospital records only mention that she presented with heart "palpitations." (*See* AR 1124. *see also* AR 1124–27.) What's more, according to the hospital's psychiatric exam, her condition was "normal" across the board, including "Mood and Affect," "Behavior," "Thought Content," and "Judgment." (AR 1127.) Per the notes, Whitlock self-reported as "anxious for 3 weeks on and off," but her "[p]ulse rate" and "blood pressure" were normal. (*Id*.) The doctor was never able to create a treatment plan, noting that they "ha[d] a long discussion," but plaintiff did "not want to stay in urgent care." (*Id*.) Whitlock "want[ed] to try something for anxiety," so the doctor "instructed her to" "come back to urgent care if she changes her mind and will get work-up done." (*Id*.) It was Whitlock herself, not her doctor, who wanted to prescribe anxiety medication. (*See id*.) The doctor refused without more testing, to which plaintiff would not consent. (*Id*.)

c. *Medical Visits (January to July 2022)*

The next set of medical notes cover a period after Whitlock filed her claim, beginning on January 7, 2022—one week before she left HUB—and continuing through July 21, 2022. (AR 1079–81.) Some of the records in this batch suffer from now-familiar shortcomings, such as an overreliance on vague, self-reported symptoms without corroborating clinical results. (*See, e.g.*, AR 1120 (Whitlock's report of "struggl[es] with

depression and difficulty with self-motivation”).) Also, the medical records from June to July 2022 are largely written by physicians in nonpsychiatric practice areas, such as her “primary” care and “OBGYN” doctors. (*See* AR 1081, 1120.) Understandably, their expertise and testing are less helpful in assessing any psychogenic disability. (*See, e.g.*, AR 1136 (record from her “Annual Exam” at her OBGYN); AR 1130–31 (“Cardiac Stress Test”); AR 1129 (“lumbar spine” “MRI”).)

The most helpful records for Whitlock’s case are the additional notes from her treating physician, Dr. Manov, who offers two diagnoses: “Generalized anxiety disorder” and “Major depressive disorder, single episode, mild.” (AR 1091.) Yet even here, Dr. Manov consistently categorized Whitlock’s “risk level” as “low” or “minimal.” (AR 1091 (“low”); AR 1094 (“minimal”); AR 1107 (“low”).) And he remarked often that her symptoms “improved” after she left her job at HUB. (*See* AR 1091, 1092, 1094, 1096.)

While a clinical diagnosis aids Whitlock’s cause, having “a true medical diagnosis does not by itself establish disability.” *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004). Rather, Whitlock “must proffer evidence not only that she has a relevant diagnosis, but also that the illness or injury precludes her from performing [all] the tasks required by her regular occupation” or from performing them for as long as normally required. *See Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015).

The evidence that comes closest to meeting this standard is a July 22, 2022 letter from Dr. Manov, summarizing his treatment of Whitlock. He noted that Whitlock’s “work environment” “was a driving force in [her] anxiety and depression.” (AR 1075.) He emphasized that “situational stressors (both work-related and personal) aggravate” her condition. (*Id.*) Leaving her job in January 2022, he opined, “allowed her to control the variable that was most closely tied to her anxiety and depression”—“the crushing work hours.” (AR 1076.) Dr. Manov also documented that Whitlock “still has episodes” but that she now works “32–40 hours [per] week” “to grow her company.” (*Id.*)

On the other hand, "a treating physician's opinion gets no special weight," *Jordan*, 370 F.3d at 879, and another licensed psychiatrist, Dr. Brown, had a more optimistic appraisal of Whitlock's work capacity. After reviewing Whitlock's patient files, Dr. Brown found that "[t]he records do not document severe and persistent symptoms." (AR 1373.) Rather, he opined that "[s]ituational factors" were the driving force, which he found was "consistent with [the] report that [plaintiff] was also working a second job throughout this time and is currently working 32 to 40 hours/week in growing that company." (*Id.*) Thus, he concluded, "[o]ccupational precluding restrictions limitations are not supported." (*Id.*)

At first blush, Dr. Manov and Dr. Brown may seem somewhat in conflict, but they agree on one key point. Both determined that Whitlock's condition worsened with "situational" stressors or factors. (*See* AR 1075, 1373.) This conclusion is devastating for Whitlock's partial-disability case. Typically, "symptoms caused by situational stressors are not disabling." *Cf. Eileen S. v. Commissioner of Soc. Sec.*, No. 3:19-cv-05083-BAT, 2019 WL 3996862, at *7 (W.D. Wash. Aug. 23, 2019) (Social Security case); *cf. also Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (affirming denial of Social Security benefits because the "medical record supports the conclusion that any depression experienced by [claimant] was situational in nature"). Also, under the policy, Whitlock must prove that she was "unable to perform all of the material and substantial acts necessary" for her usual job (or "unable to perform them for as long as normally required"). Yet she seemed to be performing them—just at her own company, not at HUB. Indeed, this was precisely why Provident denied plaintiff's claim. It reasoned that Whitlock's "job specific factors predominate[d]," and it found "no evidence or assertion of restrictions limitations due to [a] general medical condition." (AR 1517–18.)

At any rate, although Dr. Brown did not treat or evaluate plaintiff, the Court finds his opinion most persuasive on the issue of Whitlock's work capacity.

d. *Conclusions From Additional Record Review*

The Court rules that plaintiff has not carried her "burden of proof" to show that she is partially disabled and eligible for benefits under the policy. *See Muniz*, 623 F.3d at 1294.

Although the Court finds Whitlock has "a true medical diagnosis," that "does not by itself establish disability." *Jordan*, 370 F.3d at 880. While she decreased her workload at HUB and suffered a loss in income as a result, she maintained and then increased her workload at her own company. (AR 876, 1076.) In short, Whitlock has not shown that she was "unable to perform" any of "the material and substantial acts necessary" for her usual occupation nor that she had problems performing them "for as long as normally required." (*See* AR 1572.)

Accordingly, the Court grants judgment for the defense on this ERISA claim, the sole remaining cause of action.

## CONCLUSION

The Court orders as follows:

1. Defendant's motion for judgment is **GRANTED**.
2. Plaintiff's motion for judgment is **DENIED**.
3. The Clerk must issue judgment for the defense on all claims and close this case.

Dated: September 30, 2026

Hon. Andrew G. Schopler
United States District Judge